IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CARLOS LINDSEY,

                 Plaintiff,

v.

LIEUTENANT DANE ESSER and
CORRECTIONAL OFFICER RUNICE,

                 Defendants.

OPINION & ORDER

14-cv-166-jdp

---

*Pro se* prisoner Carlos Lindsey is challenging the constitutionality of a staff-assisted strip search that he underwent after requesting to be placed in clinical observation. Plaintiff's main objection to the search is that he was never given the chance to comply with a visual search, which would have allowed him to manipulate his own body rather than remain restrained as prison staff searched him. I granted plaintiff leave to proceed on claims under the Eighth and Fourth Amendments.

Defendants have now moved for summary judgment, and the material facts are not in dispute. Although defendants raise the issue of qualified immunity, I will resolve this case on the merits. Because plaintiff was defiant and aggressive in the hour or so leading up to his strip search, it was reasonable for prison staff to forgo offering him a chance to participate in a visual search. And the search itself was conducted in a professional manner, with no intent to harass or humiliate plaintiff. No reasonable jury could find in plaintiff's favor on either of his claims, and so defendants are entitled to judgment as a matter of law.

UNDISPUTED FACTS

The Preliminary Pretrial Conference Order gave plaintiff clear instructions for responding to defendants' proposed facts, including several reminders that he must cite to supporting evidence for any facts that he disputes. *See* Dkt. 16, at 13-14, 18-19. But plaintiff did not follow these instructions. For the few facts that plaintiff disputed, he did not cite to evidence that supported his version of each fact. Dkt. 51. And for the remaining facts, plaintiff offered only a general statement contesting their relevance. *Id.* The Preliminary Pretrial Conference Order expressly warned plaintiff:

> NOTE WELL: If a party fails to respond to a fact proposed by the opposing party, the court will accept the opposing party's proposed fact as undisputed. If a party's response to any proposed fact does not comply with the court's procedures or cites evidence that is not admissible, the court will take the opposing party's factual statement as true and undisputed.

Dkt. 16, at 15 (original emphasis). Plaintiff has failed to dispute or respond to any of defendants' proposed facts. Thus, where the record does not obviously contradict defendants' versions of these facts, I will accept them as undisputed. The record includes two videos of the relevant events in this case, Dkt. 50 (filed conventionally), and I draw the following facts from the evidence of record as well as from these recordings.

Plaintiff is a prisoner at the Wisconsin Secure Program Facility (WSPF), located in Boscobel, Wisconsin. Defendants Lieutenant Dane Esser and Correctional Officer Runice are correctional officers who work at WSPF. During the relevant events in this case, Esser was a lieutenant, which is a supervisory position.

Shortly before noon on December 14, 2013, correctional officers delivered a meal to plaintiff's cell at WSPF. At the time, plaintiff was on a "back of cell" precaution because he

2

had recently thrown a book at a staff member. This precaution protects staff members from dangerous behaviors that an inmate has exhibited in the past. An inmate with this status must follow a specific procedure for having items placed into his cell, including meals. The inmate must go to the back of the cell, face the wall, kneel with his ankles crossed, and place his open hands against the cell wall. The correctional officer then opens a trap door (the trap) in the door to the cell and places a clear plastic box containing the items against the opening. The inmate comes to the front of the cell, retrieves the items, and returns to the back of the cell. Finally, the correctional officer removes the box and closes the trap.

     Plaintiff initially complied with this procedure on December 14. But after retrieving his meal from the box, he did not return to the back of his cell. Instead, plaintiff began yelling at the officer who was delivering the meal, and plaintiff pushed the box out of the trap. As the officer caught the box and retreated away from the cell door, plaintiff reached his arm out of the trap to grab the guard. Plaintiff missed, but then he threw a carton of milk at the officer. Afterward, plaintiff refused to pull his arm out of the trap and back into his cell, making it impossible to close the trap. Officers informed Esser of the situation and then left plaintiff's cell to continue distributing meals to other prisoners.

     Esser arrived on the scene about 20 minutes later, and plaintiff was continuing to refuse orders from correctional officers to remove his arm from the trap. Esser spoke with plaintiff for several minutes to try to convince plaintiff to remove his arm, but plaintiff refused to comply.

     Esser obtained permission to use force from WSPF's security director, and he directed Runice to retrieve a video camera to document the incident. Once the video camera arrived, Esser gave a short introduction summarizing the situation. He then gave plaintiff another

3

direct order to pull his arm back into the cell. When plaintiff refused to comply, Esser used a Taser to subdue plaintiff, but the device had no effect on plaintiff because he had wrapped his arm in a blanket. Esser pulled out his expandable baton and raised it over his head. Plaintiff withdrew his arm before Esser took a swing with the baton. Another guard yanked the blanket free and closed the trap.

Plaintiff then began telling staff members that he was going to hang himself. Plaintiff asked to go to observation, an area of restrictive cells used to prevent an inmate from harming himself or others. Esser contacted the prison's psychologist, who confirmed that plaintiff should be taken to observation. To get to the observation cells, plaintiff would have to leave his own cell. Esser therefore directed plaintiff to place his hands through the trap to be handcuffed, in preparation for the move. Plaintiff refused to comply. Once again, Esser contacted the security director and obtained permission to use force to move plaintiff.

Esser assembled a four-person cell extraction team (which included Runice) and a camera operator who would document the entire incident. The team approached plaintiff's cell and ordered him to place his hands through the trap so that he could be handcuffed and moved to observation. Plaintiff initially refused to comply, but when he eventually agreed, the team placed plaintiff in handcuffs and leg restraints. With two armored guards on either side of plaintiff, holding his arms, and two armored guards following behind, Esser and the team escorted plaintiff to observation. On the way, they stopped by a health services room so that a nurse could treat scrapes on plaintiff's arms. After leaving the nurse, the team escorted plaintiff to a holding cell to conduct a mandatory strip search. The cell was behind a sliding door, away from the housing range where the rest of the inmates reside. None of the other inmates could see plaintiff.

4

All inmates who enter observation undergo a strip search to check for and confiscate contraband. These searches can take one of two forms: (1) a "visual" search, during which the inmate removes his own clothes and manipulates his own body (including his buttocks and his genitals) as officers visually search him; and (2) a "staff-assisted" search, during which the inmate remains in restraints, and guards remove his clothes and manually search him. A visual search would have been effective only if plaintiff cooperated with staff directions. But Esser thought that it was unlikely that plaintiff would comply with the visual strip search procedures because plaintiff had been non-compliant for the last hour. Esser therefore directed the team to conduct a staff-assisted search.

The cell extraction team lowered plaintiff to his knees in the doorway of the holding cell. With Esser and the rest of the team present, Runice used scissors to remove plaintiff's clothing. Plaintiff remained handcuffed behind his back and shackled at the ankles. Once the team removed plaintiff's clothes, the actual search lasted about 30 seconds. Two members of the team held plaintiff by the arms and shoulders as Runice conducted the strip search. As part of the search, Runice lifted plaintiff's testicles to check for contraband, and he used bladed hands (palms together, fingers in a straight line) to spread plaintiff's buttocks. Runice did not find any contraband. After the search, the team placed a towel around plaintiff's waist and escorted him to observation.

Plaintiff filed a complaint in this court on February 28, 2014. Dkt. 1. I screened the complaint pursuant to 28 U.S.C. §§ 1915 and 1915A, and I granted plaintiff leave to proceed against Esser and Runice with a claim under the Eighth Amendment for their conduct during the strip search—Runice for conducting the search, Esser for failing to intervene. Dkt. 9. Plaintiff amended his complaint to include a Fourth Amendment claim against Esser and

Runice for conducting an unreasonable search, and I allowed plaintiff to proceed with this claim as well. Dkt. 30. Esser and Runice have now moved for summary judgment on both claims. Dkt. 45. I have subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because plaintiff's claims arise under federal law.

## ANALYSIS

To succeed on their motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in plaintiff's favor because he is the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). But if plaintiff cannot establish a genuine dispute over an essential element on which he will bear the burden of proof at trial, then summary judgment for defendants is proper. *Celotex*, 477 U.S. at 322.

Defendants seek summary judgment on plaintiff's Eighth and Fourth Amendment claims. They also contend that plaintiff cannot recover compensatory or punitive damages in this case. Finally, defendants assert that they are entitled to qualified immunity. Based on the undisputed facts of this case, I conclude that no reasonable jury could find in plaintiff's favor on his Eighth and Fourth Amendment claims. Defendants are therefore entitled to judgment as a matter of law. Because this conclusion disposes of the case, I will decline to discuss the other issues that defendants raise in their motion.

I will also deny plaintiff's outstanding motion for an *in camera* inspection of Esser and Runice's disciplinary personnel files. Dkt. 35. Even assuming that prior discipline for misconduct toward an inmate would be relevant and admissible in this case, defendants have confirmed that neither Esser nor Runice have ever been disciplined for improper conduct during a strip search. Dkt. 36-2, at 3. Thus, there is no reason to believe that the disciplinary files contain evidence that would prevent me from entering summary judgment in favor of defendants.

## A. Plaintiff's Eighth Amendment claim

As the Seventh Circuit has observed, "strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). To succeed on his Eighth Amendment claim, plaintiff must therefore show that: (1) there was no legitimate security need for the search; or (2) the search was conducted in a harassing manner, intended to humiliate him and inflict psychological pain. *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015). Based on the evidence of record, I conclude that no reasonable jury could find in plaintiff's favor under either theory. Defendants are therefore entitled to summary judgment.

### 1. Legitimate need for a staff-assisted search

Section 306.17(2)(c)(2) of the Wisconsin Administrative Code authorizes strip searches of all inmates who leave or enter segregation, or who change statuses within segregation. The purpose of these searches is to protect staff and inmates, and to ensure that the inmate is not hiding an object with which to harm himself while in observation. This court has upheld such searches as generally furthering a legitimate penological interest. *See,*

*e.g.*, *Bell v. Meisner*, No. 12-cv-297, 2014 WL 556272, at *13 (W.D. Wis. Feb. 12, 2014) ("[T]his [is] a legitimate penological justification, particularly given that 'prison officials must be accorded wide-ranging deference in matters of internal order and security.'") (quoting *Meriwether v. Faulkner*, 821 F.2d 408, 417 (7th Cir. 1987)). I do not understand plaintiff to contend that these types of searches are unconstitutional *per se*. Instead, plaintiff's sole challenge to the strip search at issue in this case is that Esser did not provide him with the option to participate in a visual search before directing Runice to conduct a staff-assisted search. Plaintiff's theory of this case is that Esser was required to give him a choice, and because Esser failed to do so, Runice's contact with plaintiff's buttocks and genitals was a sexual assault.

      This court has allowed inmates to pursue Eighth Amendment claims for unlawful strip searches based on the theory that under normal circumstances, they should receive a chance to comply with a visual strip search before being subjected to a staff-assisted search. *See, e.g.*, *Vasquez v. Raemisch*, 480 F. Supp. 2d 1120, 1131 (W.D. Wis. 2007); *Cherry v. Frank*, No. 03-cv-129, 2003 WL 23205817, at *11 (W.D. Wis. Dec. 4, 2003), *aff'd*, 125 F. App'x 63 (7th Cir. 2005). Although these cases confirm that it would be a good practice for prison officials to first ask an inmate to comply with a visual search, there is no ironclad rule that every time a guard conducts a strip search, he or she must offer the inmate that choice. Such an inflexible rule would be unworkable in the context of prisons, as there will often be circumstances under which it would be unsafe, unwise, or impractical to present an inmate with this choice. Indeed, this court has acknowledged that "[i]n some cases, there may be legitimate security reasons for denying a prisoner the opportunity to comply with a visual inspection first before requiring a more intrusive manual inspection." *Vasquez*, 480 F. Supp.

2d at 1132 (citing *Cherry*, 2003 WL 23205817, at *11). Thus, the critical question in plaintiff's case is whether Esser had a legitimate reason for refusing to provide plaintiff with the opportunity to comply with a visual strip search.

Plaintiff contends that Esser did not have a legitimate reason to forgo giving him a choice to conduct a visual search because plaintiff was complying with staff instructions at the time of the search. Plaintiff states, for example, that he "willfully complied with placing his hands out [of] the trap to be cuffed and th[e]n complied with the leg restraint, as well [as] complied with being escorted from his cell 411A to the Health Service unit th[e]n he complied with escort from H.S.U. to the strip cell." Dkt. 51, at 3. By plaintiff's account, he was entirely cooperative with staff instructions, and so there was no legitimate reason to fear that he would not comply with a visual strip search.

But plaintiff's account paints a very incomplete picture of the events that occurred on December 14, 2013. In the hour or so leading up to the strip search, plaintiff was not compliant. A guard delivered lunch to plaintiff's cell just after 11:00 a.m. After a 30-second conversation, plaintiff took the meal tray from the cell box and shoved the box out of the trap, back at the guard who was giving him lunch. Dkt. 50 (Video of December 14, 2013, Cell Front Meal Pass, at 11:11:10-11:11:47). As the guard backed away from plaintiff's cell door, plaintiff reached his arm out of the trap and tried to grab the guard. When that effort failed, plaintiff threw his milk carton at the guard's head. *Id.* at 11:12:04. When a different guard came to plaintiff's cell about 15 minutes later, plaintiff refused to bring his arm back into the cell so that the guard could close the trap. Esser arrived on the scene at about 11:30, with plaintiff still refusing to take his arm out of the trap. Plaintiff had even wrapped his arm in a blanket, presumably to thwart the use of a Taser. Esser and a team of guards finally got

9

the trap closed about five minutes later, but only after winning a tug-of-war with plaintiff over the blanket.

Immediately after the altercation, plaintiff stated that he wanted to go into an observation cell because he was having thoughts of self-harm. But rather than comply with being restrained for the transfer, plaintiff simply began a new round of refusing to follow staff commands. Despite Esser's coaxing—including the threatened use of a pepper ball launcher—plaintiff refused to cooperate. Plaintiff told Esser to "suit up," a phrase that he later explained in his deposition to refer to assembling a cell extraction team. *See* Dkt. 56 (Lindsey Dep. 35:9-14). And that is what Esser did: he assembled a team of armored guards. When the team arrived at plaintiff's cell, plaintiff again refused to be restrained. After a brief conversation with one of the guards, plaintiff finally agreed to follow instructions. But even as he was walking down the hall with the cell extraction team, plaintiff was verbally abusive toward his escorts. Indeed, as the extraction team guided plaintiff to his knees in front of the strip search cell, he threatened that he would one day "light [a guard's] ass up, like a Christmas tree." Dkt. 50 (Video of December 14, 2013, Cell Extraction, at 7:00-7:03).

Five minutes of partial compliance immediately before the strip search does not undo an hour's worth of defiant behavior. This court has reviewed cases similar to plaintiff's and held that when correctional officers have legitimately restrained a prisoner, they do not violate the Eighth Amendment by performing a manual strip search instead of removing the prisoner's restraints and asking him to comply with a visual search. For example, in *Cherry*, a prisoner suspected of hiding contraband was escorted to a strip search cage, where he complied with almost all of his guards' instructions in completing a visual strip search, including lifting his genitals and spreading his buttocks. 2003 WL 23205817, at *5. But after

10

the inmate refused to follow instructions to take out his braids, the guards conducted a full staff-assisted search. *Id.* The inmate brought suit, arguing that the second search of his groin and buttocks (as part of the staff-assisted search) was unnecessary and overly humiliating because he has already completed that portion of the visual search. *Id.* at *11. The court held that the inmate's "noncompliance regarding his braids required [the guard] to restrain him during the search, [and so] a solely visual inspection was not an option. Prison officials may use physical force in response to an inmate's noncompliance with an order." *Id.*

Plaintiff does not dispute that he failed to comply with instructions several times on December 14, 2013. And video recordings from that day confirm that plaintiff was being difficult and even hostile toward WSPF staff. Given this evidence, no reasonable jury could conclude that Esser lacked a legitimate reason to keep plaintiff in restraints during the strip search.

### 2. Conduct during the search

Even if there was a valid reason for plaintiff's strip search, the manner in which that search was conducted must pass constitutional muster. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). In his complaint, plaintiff alleged that Runice inappropriately pinched and fondled him during the search. Dkt. 1, at 6-7. But based on the evidence of record, no reasonable jury could find that Runice conducted the search in a harassing or humiliating manner.

In his deposition, plaintiff clarified that he considered Runice's search to be a sexual assault only because plaintiff did not consent to be touched. Dkt. 56 (Lindsey Dep. 67:5-17). Indeed, plaintiff described Runice's search as "inspective," and he did not explicitly recount any inappropriate behavior. *Id.* (Lindsey Dep. 63:10). The other evidence of record confirms

that the search was routine. Runice's affidavit states that he conducted the search in a professional manner by explaining to plaintiff exactly what he was doing at each step of the process, and that at no time did he pinch plaintiff's buttocks or grab, pull, or fondle plaintiff's genitals. Dkt. 48, ¶¶ 41, 46. Esser's affidavit states that he observed the strip search, and that no inappropriate touching occurred. Dkt. 49, ¶¶ 43, 45-46. And incident reports that other members of the cell extraction team completed—evidence that plaintiff himself filed with the court—do not indicate that anything out of the ordinary occurred during the strip search. Dkt. 51-3, at 15-19. Thus, all of the evidence in the record confirms that plaintiff underwent a routine strip search. There is simply nothing to suggest that Runice or Esser conducted the search in an inappropriate manner or with the intent to harass or humiliate plaintiff.

The video of the incident further confirms that plaintiff's strip search was constitutionally proper, and "granting summary judgment for the defendant is appropriate when a video discredits the plaintiff's version of events." *Rivera v. Jimenez*, 556 F. App'x 505, 507 (7th Cir. 2014). Here, the video depicts the professionalism that Esser and the cell extraction team displayed before, during, and after escorting plaintiff to clinical observation. The recording captures the entire strip search, and although Runice's hands are not directly visible for parts of the search, no reasonable jury could watch the video and conclude that the guards were harassing or humiliating plaintiff. *See Boyd v. Pollard*, No. 15-1013, 2015 WL 4272098, at *2 (7th Cir. July 15, 2015) ("We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by Boyd—that the guards, when outside the camera's view, attacked Boyd."). Defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim.

### B. Plaintiff's Fourth Amendment claim

Plaintiff is also pursuing a claim against defendants for violating his Fourth Amendment right to be free from unlawful searches. Inmates do not give up all Fourth Amendment protections when they are in prison, but "given the considerable deference prison officials enjoy to run their institutions it is difficult to conjure up too many real-life scenarios where prison strip searches of inmates could be said to be unreasonable under the Fourth Amendment." *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998). The Seventh Circuit has refused to "expand the scope of Fourth Amendment protection to strip-searches of convicted prisoners to create an Eighth–Amendment–light standard in which the subjective purposes of prison officials would not be relevant." *King*, 781 F.3d at 901. Thus, to survive summary judgment, plaintiff must identify evidence that could lead a jury to conclude that the search at issue in this case was objectively unreasonable. *Id.* at 899. Because plaintiff has failed to present any such evidence, defendants are entitled to summary judgment.

As explained above, there is no dispute that Esser had reasonable grounds to conduct a staff-assisted strip search before placing plaintiff in clinical observation. Plaintiff had been non-compliant and even aggressive toward staff earlier in the day, and Esser did not want to risk another standoff with plaintiff by giving him the option to participate in a visual search. Moreover, plaintiff concedes that this case does not involve an intrusion *into* his body. Dkt. 56 (Lindsey Dep. 62:16:-63:6). Under Seventh Circuit law, this concession effectively prevents plaintiff from succeeding on a Fourth Amendment claim. *King*, 781 F.3d at 900 ("King has not alleged any intrusion into his body . . . so even if we assume such treatment of a convicted prisoner is subject to the Fourth Amendment, he has failed to state a viable claim."). Finally, the video evidence confirms that Esser, Runice, and the entire cell extraction

13

team conducted themselves professionally and appropriately. There is no evidence from which a jury could conclude that plaintiff's staff-assisted strip search was objectively unreasonable. Defendants are therefore entitled to summary judgment on plaintiff's Fourth Amendment claim.

## ORDER

IT IS ORDERED that:

1. Plaintiff Carlos Lindsey's motion for an *in camera* inspection, Dkt. 35, is DENIED.

2. Defendants Lieutenant Dane Esser and Correctional Officer Runice's motion for summary judgment, Dkt. 45, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered September 2, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge